**SKIFF RE BUSINESS, INC. d/b/a Re/Max 440–Doylestown, Appellant**

v.

**BUCKINGHAM RIDGEVIEW, LP and Scott and Tara Irvin.**

**Appeal of Skiff re Business, Inc. d/b/a Re/Max 440–Doylestown and Scott and Tara Irvin.**

Superior Court of Pennsylvania.

Argued Sept. 22, 2009.

Filed March 19, 2010.

---

Mark D. Pfeiffer, Philadelphia, for Irvin, appellants.

Daniel R. Utain, Blue Bell, for appellee.

BEFORE: FREEDBERG, CLELAND and KELLY, JJ.

OPINION BY CLELAND, J.:

¶ 1 Appellants Skiff re Business, Inc. d/b/a Re/Max 440–Doylestown (Skiff) and Scott and Tara Irvin (Irvins) appeal the order of the trial court directing entry of judgment for Buckingham Ridgeview, LP. (Buckingham) on causes of action for slander of title, tortious interference with contractual relations, and a brokerage commission. We reverse the trial court on the slander of title and tortious interference actions but affirm on the trial court's denial of a brokerage commission.

¶ 2 This litigation is a three-act play involving three major and several minor characters. Skiff is a real estate brokerage firm which sued Buckingham for a brokerage commission its agent, Scott Irvin (Irvin),[1] allegedly earned on Buckingham's sale of a residential lot to David and Mary Bloom (Blooms). Buckingham counterclaimed against Skiff for slander of title and for tortious interference with contractual relations. Buckingham also joined Irvin and his wife, Tara, in a third party complaint for the slander of title and tortious interference causes of action.

¶ 3 Playing minor but still important roles were DV Ridgeview, LLC, a limited liability company which was the general partner of Buckingham, a limited partnership composed of two limited partners, James A. D'Angelo, Jr. (D'Angelo) and Thomas Verrichia (Verrichia). D'Angelo and his wife, Tara,[2] were the owners of D'Angelo Construction, Inc. D'Angelo and Verrichia were the only members of the LLC.

¶ 4 The plot revolves around a confessed judgment Irvins entered against D'Angelos on November 13, 2006, following a failed lending and business relationship Irvins developed with the D'Angelos and D'Angelo Construction, Inc. during the period 2003 through 2006.[3][4] When D'Angelos failed to pay one of the loans, Irvins confessed judgment for $271,753.42.

¶ 5 On August 31, 2005, over a year earlier, because Buckingham had acquired a 46.3 acre tract (Lands) by a deed reciting Buckingham held a portion of the tract—Lot 5—as a straw party for D'Angelos, Act III of the play dwells on the impact of Irvins' judgment on D'Angelos' and Buckingham's real estate interests[5] and leads us to assess the questionable conduct by

---

1. Any reference to "Irvin" in this Opinion will be to Scott Irvin while any reference to "Irvins" will be to Scott and Tara Irvin.

2. Any reference to "D'Angelo" in this Opinion will be to James A. D'Angelo while any reference to "D'Angelos" will be to James A. and Tara D'Angelo.

3. One such loan to D'Angelos provided, upon the occurrence of a specified future event, for $100,000 of loan repayment to be "paid" in the form of a new ownership interest by Irvins in D'Angelo Construction, Inc. N.T. Trial, 4/8/08, Defendants' Exhibit 2; Decision, 6/16/2008, Findings of Fact 23.

4. References to the trial court's Findings of Fact and Conclusions of Law set forth in its

June 16, 2008 Decision will be abbreviated as "FOF" or "COL."

5. The same deed recited that Buckingham was straw party for William and Maria Reiner for Lot 7 and for Thomas Verrichia for Lot 6. There were to be 8 lots altogether. D'Angelos' consideration for Lot 5 was to be one half of the costs to capitalize Buckingham and to satisfy the remaining balance on a Wilmington Trust mortgage which had financed Buckingham's acquisition of the land in the first instance. At the same time as Buckingham received the deed, Buckingham, D'Angelos and Verrichias executed a Straw Party Agreement memorializing their straw party arrangements.

Irvin which provoked the litigation before us.

¶ 6 On June 16, 2008, after a bench trial, the trial court rendered a verdict denying Skiff its brokerage commission and awarding $24,000 in damages to Buckingham on the slander of title and tortious interference claims against Skiff and Irvins. On August 12, 2008, the trial court denied Skiff's and Irvins' post trial motions and directed entry of judgment which occurred on August 15. On September 30, 2008, following Skiff's and Irvins' timely appeal, the trial court issued a Rule 1925 Opinion in response to the appellants' Statement of Errors Complained of On Appeal.

¶ 7 Returning to the factual history, in April 2005, Blooms approached Irvin about acquiring some choice residential land. Irvin showed him Lot 3 of the Lands. Blooms paid a $100 deposit to D'Angelo Construction, Inc., believed, albeit mistakenly, by Irvin to be the owner of the Lands. Irvin neither disclosed his lending relationship with D'Angelos or D'Angelo Construction, Inc. nor his incipient ownership interest in the company. Months later, in October 2005, Buckingham submitted a proposed agreement of sale but Blooms did not sign. Blooms, in turn, on December 3, 2005, presented Buckingham with a proposed agreement of sale which Buckingham did not sign. On December 4, Irvin, even though he had been representing Blooms since April, finally caused Blooms to sign a Broker Agreement with Skiff.

¶ 8 Finally, on February 2, 2006, Bloom joined Buckingham in signing an Agreement of Sale (Bloom AOS), drafted by Irvin, which required Bloom to pay a deposit to D'Angelo Construction, Inc. Irvin, it appears, still labored under the misconception D'Angelo Construction was a co-owner of the Lands, including Lot 3.

¶ 9 On March 8, 2006, 11 months after his relationship with Blooms had begun, Irvin belatedly delivered to Blooms a Consumer Notice required by the Real Estate Licensing and Registration Act, 63 P.S. §§ 455.101–455.902 (RELRA), and regulations promulgated thereunder at 49 Pa. Code §§ 35.1–35.392.

¶ 10 Throughout the rest of 2006 and well into 2007, Buckingham continued processing its application for subdivision approval by Buckingham Township. Among the conditions to be satisfied were a conveyance of public easements to the township for which issuance of a clean title insurance policy was prerequisite and, of course, a commitment to construct various public infrastructure improvements.

¶ 11 On April 17, 2006, D'Angelo, for himself and his wife, executed a Limited Partner Withdrawal and Assignment Agreement (Withdrawal Agreement) by which they withdrew as limited partners of Buckingham and terminated their equitable interest in Lot 5. Buckingham paid D'Angelos $180,000 and released them of continuing contribution-of-capital obligations.[6] Wilmington Trust, Buckingham's mortgage lender on the Lands, released D'Angelos of their personal guarantees.

¶ 12 On November 13, 2006, Irvins entered their judgment. They, however, never informed Bloom or Buckingham of their financial relationship with D'Angelos until March 2007.

¶ 13 In the meantime Buckingham continued to pursue subdivision approval but encountered a roadblock when, in March

---

6. One year later, on April 11, 2007, the D'Angelos signed Amendment No. 1 to the Straw Party Agreement by which D'Angelos confirmed their equitable interest in Lot 5 had been terminated or extinguished with the April 2006 Withdrawal Agreement.

2007, its title insurance agent issued a title report setting forth the Irvin judgment as a possible lien or a cloud on title on all the Lands,[7] not merely on Lot 5 in which D'Angelos had, in August 2005, acquired an equitable interest. Because the township insisted on clear title to the anticipated easements, the subdivision approval process ground to a halt. Buckingham, through its attorney, immediately contacted Irvin and requested a lien release, explaining that, because the April 2006 Withdrawal Agreement extinguished D'Angelos' equitable interest, there was nothing to which Irvins' November 2006 judgment could encumber. In addition to sending the documentation supporting its contention, Buckingham further explained Irvins' lack of cooperation would delay subdivision approval and the Bloom closing on Lot 3.

¶ 14 Irvins' attorney advised Irvins their judgment, to the contrary, did constitute a lien on Lot 5 and, perhaps, on all the Lands. FOF 96. In late March, Irvin contacted Bloom to forewarn Bloom of the Irvin judgment lien issue, urging Blooms to "protect" themselves by forcing Buckingham to resolve the lien issue to ensure clear title. Blooms immediately informed Buckingham they would not close without resolution of the title issue, but, nonetheless, on June 11, 2007, did close without any payment to Irvins.

¶ 15 On April 12, 2007, Irvins' advised Buckingham's attorney that, unless paid, Irvins would not sign a lien release and would otherwise slow down the subdivision approval process and Bloom closing in effort to collect.

¶ 16 Buckingham refused to pay and directly appealed to the title insurance company to review the title insurance agent's initial report. On May 10, 2007, the title company issued a clean policy without exception for any Irvin judgment lien. Buckingham proceeded to finalize its subdivision approval and scheduled the Bloom closing for May 30.

¶ 17 On May 24, after learning of the clean title policy, Irvins' attorney threatened the title company Irvins would execute on their judgment if the company insured any of the Lands in which D'Angelos had an equitable interest without paying off the Irvin judgment. N.T. Trial, 4/8/08, Defendant's Exhibit 19.

¶ 18 The sequel to the three-act play opened in the Bucks County Court of Common Pleas in July 2007.

¶ 19 The trial court ruled Skiff forfeited any right to a commission on the Bloom sale because Irvin, as Skiff's agent, violated numerous requirements of the RELRA. The court determined the Withdrawal Agreement extinguished the D'Angelo equitable interest in Lot 5 or in any of the Lands and, thus, the subsequently entered Irvin judgment never encumbered any of the Lands, let alone Blooms' Lot 3. The court concluded Irvin as well as his wife and his principal, Skiff, slandered Buckingham's title when Irvin, in late March 2007, warned David Bloom to seek protection from the Irvin judgment, and when Irvins' attorney, on May 24, 2007, directly contacted the title company. Lastly, the court concluded Irvins and Skiff tortiously interfered with Buckingham's efforts to consummate its contracts with the title company and Blooms. The court awarded Buckingham $24,000 in damages Buckingham suffered when the delays in the

---

**7.** At first blush the impact of the Irvin judgment would seem confined to Lot 5 and, thus, irrelevant to subdivision approval or the Bloom sale. In reality, however, the proposed township easements were to extend over all the Lands, *including Lot 5*, and so any lien on Lot 5 would necessarily encumber the easements to an extent. FOF 91.

Bloom closing caused an additional three months of mortgage interest and an increase in the cost of its subdivision site development work.

¶ 20 Skiff and Irvins present the following issues for appellate review:

1. Did [Irvins'] judgment constitute a lien against [D'Angelos'] equitable interest in [Buckingham's] real estate?

2. Did [Buckingham] prove its claim for slander of title?

3. Did [Buckingham] prove its claim for tortious interference with contractual relations?

4. Is the tortious conduct of [Irvin] attributable to his employer and wife?

5. Is [Skiff] entitled to recover on its claim for commissions on the sale of real estate?

Appellants' Brief at 4.

¶ 21 Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. *Allegheny County Housing Authority v. Johnson,* 908 A.2d 336, 340 (Pa.Super.2006). Our scope of review regarding questions of law is plenary. *Id.*

### Did Irvins' judgment constitute a lien against D'Angelos' equitable interest in Buckingham's real estate?

■ ¶ 22 Our Supreme Court has described the nature of a judgment lien as follows:

When entered of record, the judgment also operates as a lien upon all real property of the debtor in that county.

42 Pa.C.S. Sections 4303(a)(b), 1722(b) and 2737(3).

The judgment lien represents security for the underlying debt, *Commonwealth v. Meyer,* 169 Superior Ct. [Pa.Super.] 40, 82 A.2d 298 (1951), and conveys a right of execution to the judgment creditor in satisfaction of his debt. **The judgment not only affects all real property owned by the debtor, but extends to his equitable interests,** *Auwerter v. Mathiot,* 9 Serg. and R. [Serg. & Rawle] 397 [1823 WL 2188] (1823) and beneficial interests as well *Davis v. Commonwealth Trust Company,* 335 Pa. 387, 7 A.2d 3 (1939).

The existence of a judgment lien prevents a debtor from encumbering or conveying any property he might own in such a way as to divest the effect of the judgment, while also preventing later lienholders from satisfying their debt without first paying the earlier lien. The judgment lien thus constitutes a liquidated claim, *Educational Society v. W.D. Gordon,* 310 Pa. 470, 166 A. 499 (1933), which has value to the judgment creditor. The judgment can be assigned, pledged, or used as collateral and is a valuable form of property. We have already decided that a judgment is property and that a judgment creditor's interest cannot be deprived without due process of law. *Pennsylvania Company v. Scott,* 346 Pa. 13, 29 A.2d 328 (1942).

*In re Upset Sale, Tax Claim Bureau of Berks County,* 505 Pa. 327, 334–335, 479 A.2d 940, 943–944 (1984) (emphasis added). As noted, a judgment even encumbers an equitable interest as arises in an executory agreement of sale of real estate. *See Clairton Corp. v. Chicago Title Ins.,* 438 Pa.Super. 488, 652 A.2d 916, 920 (1995) (holding "a lien may attach to an equitable interest in property, and it cannot be divested by a conveyance by the debtor.").

¶ 23 Irvins contend, therefore, their November 2006 judgment encumbered D'Angelos' equitable interest in Lot 5 which had arisen in the August 2005 deed to Buckingham reciting Buckingham held Lot 5 as a straw party for D'Angelos. The flaw in Irvins' contention is the termination of D'Angelos' equitable estate when James D'Angelo, for himself and his wife, Tara, executed the April 17, 2006 Withdrawal Agreement, thus leaving no equitable interest for Irvins' November 2006 judgment to encumber. FOF 74–78.[8]

¶ 24 Irvins argue Recording Act § 351 deems "fraudulent and void" any termination of an executory real estate contract, or equitable estate created thereunder, as against the rights of a "subsequent bona fide purchaser or mortgagee or holder of any judgment." 21 P.S. § 351. However, because we conclude Irvins were on constructive notice of the termination of D'Angelos' equitable estate, any failure by D'Angelos to record the Withdrawal Agreement is, therefore, not "fraudulent and void" against a subsequent judgment creditor.[9] Judgment creditors, like bona fide purchasers and mortgagees, cannot avail themselves of the protective umbrella of this recording statute if they have actual or constructive notice of an unrecorded instrument. *See Malamed v. Sedelsky,* 367 Pa. 353, 356–357, 80 A.2d 853, 855 (1951), which held "the recording acts as thus amended [in 1931] do not protect the [judgment creditor] to any greater extent that they would a purchaser or mortgagee

who had actual or constructive notice of a prior unrecorded deed...."

¶ 25 The constructive notice rules are relevant here. As early as the October 2005 first draft of a Bloom agreement of sale and certainly with the final Bloom AOS in February 2006, Irvin knew Buckingham had an ownership interest in the Lands. Previously, and continuing into February 2006, he still believed D'Angelo Construction was an owner. FOF 57. A reasonable creditor of D'Angelos, contemplating confessing judgment, would have examined the real estate records to ascertain the identity of the true owner—D'Angelo Construction and/or Buckingham—and, upon finding the August 2005 deed into Buckingham, would have inquired directly of Buckingham about the state of title to D'Angelos' Lot 5. In the process, it would have been in Buckingham's self-interest to have informed Irvin that D'Angelos had terminated their equitable estate in Lot 5 at the time of the Withdrawal Agreement. Thus, we conclude Irvins were on such constructive notice of the termination of the equitable estate as to fall outside the protection § 351 accords bona fide purchasers, mortgagees and judgment creditors.

¶ 26 Irvins also invoke § 444 of the Recording Act, which imposes a 90–day deadline for recordable instruments to be recorded or else be deemed "fraudulent and void against any subsequent purchaser or mortgagee for a valid consideration, or any creditor of the grantor or bargainor in

---

8. We acknowledge that the Withdrawal Agreement does not expressly mention the termination of D'Angelos' interest in Lot 5 and that Tara D'Angelo did not sign the Withdrawal Agreement, but we note Amendment No. 1 to the Straw Party Agreement, executed April 17, 2007, by both D'Angelos, acknowledged and confirmed the intention of the Withdrawal Agreement and the parties to extinguish the equitable estates of both D'Ange-

los. Irvins failed to challenge this finding of fact on appeal.

9. Although the trial court did not ground its decision on the constructive notice rule, we may, nonetheless, affirm on a different basis. *Second Federal Sav. and Loan Ass'n v. Brennan,* 409 Pa.Super. 581, 598 A.2d 997, 1000 (1991).

said deed of conveyance." 21 P.S. § 444. Irvins point out the Withdrawal Agreement terminating the equitable estate was executed April 17, 2006, but was not recorded within the 90–day period ending in July, and, therefore, should be deemed void against Irvins' November 2006 judgment.

¶ 27 There are, however, two flaws in this position. First, § 444 provides protection only for a creditor of a "grantor or bargainor in [a] deed of conveyance." Here, there was no deed of conveyance. Second, § 444 has been construed by our Supreme Court to protect purchasers and mortgagees, but definitely not creditors, even though creditors appear to be within the protected group. *Rosa v. Hummel*, 252 Pa. 578, 580, 97 A. 942, 942 (1916). The *Rosa* court held:

> While the recording Acts of May 25, 1878, P.L. 151, and of May 19, 1893, P.L. 108, [21 P.S. § 444,] protect subsequent innocent purchasers or mortgagees, they do not protect judgment creditors. In the act of 1893 the words 'any creditor of the grantor' appear, but it was pointed out in *Davey v. Ruffell*, 162 Pa. 443, 29 Atl. [A.] 894 [ (1894) ], that these words are inoperative, as no method is provided by which creditors may place

themselves upon the record in advance of a deed or mortgage.

*Id.* at 580, 97 A. 942.[10]

¶ 28 We hold the trial court's findings are supported by the record and agree with its conclusion the Irvin judgment did not encumber Buckingham's Lands, including Lot 3.[11]

### Did Buckingham prove its claim for slander of title?

■ ¶ 29 Having determined Irvins' judgment never encumbered D'Angelos' equitable estate, we next address whether Irvins' conduct slandered Buckingham's title. Our Supreme Court, relying on Restatement (Second) of Torts § 623(A) (1977), has defined the tort as:

> the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

*Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 570 Pa. 242, 809 A.2d 243,

---

10. We note the Legislature amended § 351 in 1931 to enlarge the class of protected persons to include a "holder of any judgment" but has not similarly amended § 444. In amending the recording statute in 1931, but leaving § 444 intact, the Legislature is presumed to have accepted or endorsed the interpretation placed on § 444 by both *Rosa* and *Davey*. See *Hunt v. Pennsylvania State Police of Com.*, —— Pa. ——, 983 A.2d 627, 637 n. 15 (2009) (holding "The rules of statutory construction counsel when 'a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.' 1 Pa.C.S.A. § 1922(4).").

11. We distinguish *Clairton Corp., supra*, cited by Buckingham as additional authority why Irvins' judgment never constituted a lien. *Clairton* held a lien does not attach to an equitable interest under an installment land contract except to the extent the vendee has paid purchase money. *Id.* at 920. Buckingham asserted D'Angelos never paid any purchase money to Buckingham so the Irvin lien could never attach. On the contrary, the Straw Party Agreement provided the deeds to D'Angelos, Reiners and Verrichias would be executed and delivered "upon recording of the Subdivision Plan" without mention of any payment or further payment due. N.T. Trial, 4/8/08, Defendants' Exhibit 23.

246 (2002) (citations and quotation marks omitted).

¶ 30 Focusing on the fourth element in the above definition, we view the question, whether Irvins' judgment constituted a lien on D'Angelos' equitable estate, as one subject to reasonable debate (as the parties' appellate briefs in this appeal so aptly attest), and, as a consequence, most definitely not a situation where the trial court could conclude Irvins *knew they had no lien* or *acted in reckless disregard of the truth or falsity of their claim of lien status.*

¶ 31 We have previously defined "reckless disregard of the truth":

> And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," we have made clear that the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," or must have "entertained serious doubts as to the truth of his publication. . . ."

*Fitzpatrick v. Philadelphia Newspapers, Inc.,* 389 Pa.Super. 438, 567 A.2d 684, 688 (1989) (internal citations omitted). Moreover, "Failure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits." *Id.* (internal citations omitted).

¶ 32 Irvins' lien claim falls considerably short of a reckless disregard for the truth. The trial court found Irvins consulted an "acknowledged, recognized and experienced" attorney with respect to the documentation provided by Buckingham to rebut the lien claim. FOF 95. The trial court found Irvins' attorney "advised Scott Irvin that the Irvin Judgments constituted a valid lien against the Land, but that [the attorney] was not sure how much of the Land was encumbered by the lien." FOF

96. Irvins' reliance on advice of counsel rebuts the charge Irvins harbored a "high degree of awareness of . . . [the] probable falsity" of their lien claim. *See Terletsky v. Prudential Property and Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 690 (1994) (holding insurer's reliance on opinion of outside counsel, even though erroneous, provided reasonable basis for insurer's conduct and exonerated it of damages under the insurance company "bad faith" statute, 42 Pa.C.S.A. § 8371). *See also In re Lare's Estate,* 436 Pa. 1, 257 A.2d 556 (1969) (holding reliance on advice of counsel negated bad faith by trustee).

¶ 33 Irvins' counsel delivered his advice in the context of the documents presented by Buckingham's counsel. Buckingham's principal argument was D'Angelos' equitable estate had terminated upon execution of the Withdrawal Agreement seven months before Irvins entered their judgment. This agreement, however, was signed only by James D'Angelo, not his wife, who was co-owner of the equitable estate, and this agreement failed to specifically refer to the Lands. It was reasonable for Irvins and their counsel to honestly believe D'Angelos' equitable estate continued beyond the date Irvins entered judgment.[12]

¶ 34 We, therefore, hold the trial court's erred in concluding the foregoing evidence satisfied the fourth element of a slander-of-title cause of action—knowledge the lien claim was false or acting in reckless disregard of its truth or falsity.

### Did Buckingham prove its claim for tortious interference with contractual relations?

¶ 35 We have defined the elements of tortious interference with contractual relations as follows:

---

12. We note the independent title examiner engaged by Buckingham to procure a title insurance policy concluded, in March 2007, D'Angelos' judgment was at least a cloud on title. FOF 90, 91, 104.

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Pelagatti v. Cohen,* 370 Pa.Super. 422, 434, 536 A.2d 1337, 1343 (1987) (citations omitted). *See also Small v. Juniata College,* 452 Pa.Super. 410, 417, 682 A.2d 350, 354 (1996) (same).

In determining whether a particular course of conduct is improper for purposes of setting forth a cause of action for intentional interference with contractual relationships, or, for that matter, potential contractual relationships, the court must look to section 767 of the Restatement (Second) of Torts. This section provides the following factors for consideration: 1) the nature of the actor's conduct; 2) the actor's motive; 3) the interests of the other with which the actor's conduct interferes; 4) the interests sought to be advanced by the actor; 5) the proximity or remoteness of the actor's conduct to interference, and 6) the relationship between the parties. *Triffin v. Janssen,* 426 Pa.Super. 57, 62–64, 626 A.2d 571, 574 (1993), *alloc. den.,* 536 Pa. 646, 639 A.2d 32 (1994).

*Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super.1997).

¶ 36 The trial court found tortious interference in Irvin's attorney's letter to the title insurance company from whom a clean title policy was a precondition to conveyance of the easements, subdivision approval, and the Bloom closing. The court also found tortious interference in Irvin's advice to David Bloom that he demand protection from the Irvin judgment by insisting Buckingham pay it off. COL 30–35.

¶ 37 Skiffs and Irvins dispute they tortiously interfered with Buckingham's contractual relations with Bloom, the township, and the title insurance company. Irvins argue they were justified in asserting their lien, a conclusion with which we agree but only with reference to Lot 5. In asserting their lien, Irvins claim to have acted in good faith and with proper means. Finally, Irvins argue Buckingham did not suffer any damages. Appellant's Brief at 25–27.

¶ 38 We will first address the issue whether Irvins were privileged or justified in their advancing their lien claim.

¶ 39 As discussed above, Irvins' claim of a lien on D'Angelos' equitable estate in **Lot 5** was reasonable, albeit ultimately unfounded. The trial court found Irvins claimed a lien on *all the Lands,* including Bloom's equitable estate in Lot 3 and the lands on which the township required easements as a condition to subdivision approval. FOF 101, 104, 112–113, 115. We, however, conclude the evidence of record does not support a finding Irvins claimed a lien over all the Lands.

¶ 40 The trial court pointed, in particular, to the May 24, 2007 letter Irvins' attorney sent to the title insurance company and found this letter asserted a lien on all the Lands. FOF 112–113. The letter, however, was far more limiting when it stated the judgment:

constitutes a lien on all real estate held by Mr. and Mrs. D'Angelo in Bucks County. In the event that the judgments are not fully satisfied upon the

closing on the sale of real estate in which Mr. and Mrs. D'Angelo have an equitable interest in, the buyer will take subject to our liens and we will thereafter move to execute on the subject property by having the property sold at Sheriff's Sale.

N.T. Trial, 4/8/08, Defendant's Exhibit 19.

¶ 41 As worded, the letter did not claim a lien on Bloom's Lot 3 or any lands other than the real estate interests equitably owned by D'Angelos. Although the March title agent's report characterizing the judgment as a cloud on title slowed down issuance of the title policy and, thus, delayed subdivision approval, conveyance of the easements, and the Bloom closing, we cannot fault Irvins simply because their judgment complicated Buckingham's development of a subdivision. Although the trial court emphasized Irvins refused to sign a lien release to facilitate matters, a judgment creditor has no legal duty to gratuitously sign such releases. *See* FOF 92, 101–104.

¶ 42 The trial court also found Irvin's late March contact of Blooms advising them to protect themselves against the lien issue was tortious interference with Buckingham's contractual relations with Blooms. Regardless of motive or self-interest, because Buckingham's title agent was making a title issue out of the Irvin judgment, it was not improper for a real estate agent to warn his client about the title issue. Real estate agents are required "to be loyal to the buyer by taking action that is consistent with the buyer's interest in a transaction." RELRA § 455.606c(1). An agent also is duty bound to "advise the consumer regarding the status of the transaction," which would certainly include the potential impact of the Irvin judgment on the Bloom closing. RELRA § 455.606a(10).

¶ 43 We have been unable to unearth support in the record for the trial court's legal conclusions that Irvin's communication of a lien claim to the title company or his advice to Bloom was improper or unprivileged. It was the title agent's March report which set in motion a request by Buckingham's attorney to request Irvins sign a lien release and, when not forthcoming, to request the title company to re-visit the title issue. Irvins had no obligation to quiet the concerns of the title agent, title company or Buckingham by signing a lien release. Irvins had a right to claim a lien on D'Angelos' Lot 5, even though ultimately unfounded. If the lien claim affected the title policy application and subdivision approval process, Irvins remained entitled to assert their lien, the same as any other judgment creditor might. Restatement § 767 recognizes the "rules of the game" can legitimize such tactics:

> Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not "sanctioned by the 'rules of the game.'" The determination is whether the actor's interference is "improper" or not.

Restatement (Second) of Torts § 767, Comment on Clause (g).

¶ 44 Although not binding on us, we find persuasive the holding in *Peoples Mortg. Co., Inc. v. Federal Nat. Mortg. Ass'n,* 856 F.Supp. 910 (E.D.Pa.1994) that:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise

be impaired or destroyed by the performance of the contract or transaction. *Peoples Mortg. Co., Inc.,* 856 F.Supp. at 939 (quoting § 773 of the Restatement (Second) of Torts). *See Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.,* 982 A.2d 94, 101 (Pa.Super.2009) (stating the Superior Court has adopted § 773). *Peoples Mortg. Co., Inc.* held § 773's good faith assertion of a legally protected interest is not improper even though the interest does not exist or proves unfounded. *Peoples Mortg. Co., Inc.,* 856 F.Supp. at 939–943.

¶ 45 We hold the trial court erred in concluding Irvin's advancement of a lien claim was not privileged or proper. Accordingly, we will not address the other elements of tortious interference at issue in this case.

### Is the tortious conduct of Irvin attributable to his employer and wife?

¶ 46 Because we conclude Irvin did not tortiously interfere with Buckingham's contractual relations, we do not reach the issue whether Irvin's wife or Skiff were vicariously liable.

### Is Skiff entitled to recover on its claim for commissions on the sale of real estate?

■ ¶ 47 The February 2, 2006 Bloom AOS, together with the February 14, 2006 Broker's Fee Agreement incorporated therein, obligated Buckingham to pay a 3% brokerage commission.[13] The trial court determined Skiff was not entitled to a brokerage commission because of numerous violations by Irvin of Skiff's duties under the RELRA and its regulations.

Specifically, the trial court singled out the following transgressions:

55. S. Irvin failed to comply with Pennsylvania's Real Estate Licensing and Registration Act, 63 P.S. § 455.101 *et seq.* ("RELRA"), the regulations promulgated by the Commission in Title 49 of the Pennsylvania Code and/or by PAR, and/or Skiff's internal operating policies by:

(a) Failing to read or present the Consumer Notice to the Blooms at their first substantive communication or otherwise indicate that such notice was given (See D–10);

(b) Failing to obtain a signed acknowledgement of the Consumer Notice in a timely manner (See D–10);

(c) Participating in a transaction involving property that the agent has, or may have, an ownership interest in without first disclosing the interest (See 49 Pa.Code §§ 35.283 and 35.392; 63 P.S. § 455.606);

(d) Failing to disclose to the Blooms S. Irvin's financial involvement with J. D'Angelo and/or D'Angelo Construction in a timely manner (See 49 Pa.Code §§ 35.283 and 35.284);

(e) Failing to disclose to Buckingham S. Irvin's involvement with J. D'Angelo and/or D'Angelo Construction (See 40 Pa.Code §§ 35.283 and 35.284);

(f) Failing to deal honestly and in good faith (see D–10; 63 P.S. § 455.606(a)(2); 49 Pa.Code § 35.392(2)); and

(g) Failing to obtain a signed Broker Agreement from the Blooms prior to representing them (See D–9; *Roddy, Inc. v. Thackray Crane Rental, Inc.,* 2001 WL 1807953, *3 (C.C.P.Phi-

---

**13.** The Bloom AOS, although dated February 2, was actually signed by the parties over the period February 6 to 16. The incorporated

Broker's Fee Agreement was signed by D'Angelo and Verrichia, on behalf of Buckingham, on February 14.

la.Co.2001), affirmed, 803 A.2d 804 (Pa.Super.2004) [ (Pa.Super.2002) ]). COL 55.

¶ 48 Clearly, Skiff was bound by the violations committed by Irvin in the scope of his employment. "In order for the servant's tortious conduct to be found within the scope of employment (1) the injurious action must have been committed within the time and space of the employment; and, (2) the servant's activity must in some way further the employer's business." *Johnson v. Glenn Sand and Gravel,* 308 Pa.Super. 22, 453 A.2d 1048, 1050 (1982).

¶ 49 Irvin's most serious infraction was his failure to disclose his conflict of interest stemming from his financial relationship with D'Angelos and D'Angelo Construction, Inc. Although he began promoting the sale of Lot 3 in April 2005 when Bloom paid a $100 deposit to D'Angelo Construction, Inc., there is no evidence he informed Bloom of his financial relationship with D'Angelos or the construction company until March 2007 when the title report suddenly drew everyone's attention to the Irvin judgment. Irvin should have disclosed in April 2005 that he was serving two masters—on the one hand, his client, Bloom, and on the other hand, his debtor-business partner who had a stake in the possible sale by Buckingham to Bloom.[14] His conflict of interest provokes the disturbing question whether he influenced the price and terms of the Bloom AOS to favor Blooms or D'Angelos. Irvin's non-disclosure violated his duty to "timely disclose to the consumer any conflicts of interest." RELRA § 455.606a(7); 49 Pa.Code § 35.383(f). His silence also violated his duty to disclose his actual or incipient

ownership interest in D'Angelo Construction, Inc. 49 Pa.Code § 35.283(a); RELRA § 455.606a(13). Irvin's intrusion into Buckingham's title insurance and subdivision approval process and advice to Bloom to obtain "protection" injected his self-interest into the Bloom closing and threatened its consummation. His self-interest prevented him from discharging his duty to Bloom under RELRA § 455.606a(a)(2) "to deal honestly and in good faith."

¶ 50 RELRA strives to protect consumers of real estate services by requiring a written agreement between the broker and the consumer. RELRA § 455.606a(c). Irvin represented Blooms from April 2005 but did not enter into a written agreement until December 5, 2005, when Blooms and Buckingham were exchanging drafts of agreements of sale leading to the February 2, 2006 Bloom AOS. RELRA's regulations mandate that brokers "shall provide the consumer with the Consumer Notice at their initial interview." 49 Pa.Code § 35.336(a). The Consumer Notice is an extensive notice to the consuming public of a broker's duties to deal honestly and in good faith with his client, to disclose any conflicts of interest, and to represent his client and not the other party. The Consumer Notice details the specific services to be provided, amount of brokerage fees, duties regarding escrows or deposits, duty to comply with the RELRA, and other matters. Irvin, however, flagrantly violated this fundamental requirement. His attempt to cure his omission occurred *after* the Bloom AOS and the Broker's Fee Agreement were signed in February 2006.

¶ 51 RELRA does not specifically address whether substantial violations war-

---

**14.** Lot 3 ultimately sold to Blooms for $400,000. N.T. Trial, 4/8/08, Defendant's Exhibit D–13.

rant a forfeiture of a commission. We, however, find persuasive the reasoning by the Philadelphia County Court of Common Pleas in *Roddy, Inc. v. Thackray Crane Rental, Inc.,* 2001 WL 1807953 (Pa.Com. Pl.2001) [15] which held a significant violation of the RELRA could constitute a defense to a brokerage commission claim. *Roddy* held a broker was not entitled to a commission from a buyer when the parties' arrangement was oral rather in writing as required. RELRA § 455.606a(b)(1) mandates "the licensee is not entitled to recover a fee, commission or other valuable consideration in the absence of such a signed agreement" with the consumer of the brokerage services. *See Roddy* at *3. It further held § 455.608a requires certain specified provisions to be set forth in any agreement between a broker and consumer obligating the consumer to pay a fee. These provisions must be in writing and include:

> (2) A statement describing the nature and extent of the broker's services to be provided to the seller/landlord or buyer/tenant and the fees that will be charged.
>
> . . . .
>
> (7) A statement regarding any possible conflicts of interest and informing the consumer of the licensee's continuing duty to timely disclose any conflicts of interest.

RELRA § 455.608a(2) and (7). *Roddy* relied, in part, on two Superior Court cases:

> Additionally, recent cases have used specific provisions of the RELRA as a defense to a claim for a real estate commission. *See Meyer* [*v. Gwynedd Development Group* ], 756 A.2d [67,] 72–73 [ (Pa.Super.2000) ] (affirming summary judgment in favor of builder on the ground that the director was a "builder-owner salesperson" and needed a license under the RELRA in order to sue for a real estate commission); *Golibart v. Reamer,* 415 Pa.Super. 623, 625, 610 A.2d 56, 57 (1992) (person hired to help find investors in real estate development project could not recover fee because he was not a licensed real estate broker).

*Id.* at *4.

¶ 52 We refrain, without comment, from adopting the conclusion in *Roddy* that significant provisions of the RELRA can be read into a broker-consumer contract and, thus, affect the "substantive law of contracts." *Id.* at *3–4.[16] Instead, we hold the December 4, 2006 Broker Agreement, including the later delivered Consumer Notice, already included these same consumer-protection provisions set forth in the RELRA and adopted by the trial court in its application of the *Roddy* rationale.[17, 18]

---

**15.** *Roddy* was affirmed at 803 A.2d 804 (Pa.Super.2002) (unpublished memorandum).

**16.** We direct attention to *Liss & Marion, P.C. v. Recordex Acquisition,* 603 Pa. 198, 983 A.2d 652 (2009) where the Supreme Court held the pricing provisions of the Medical Records Act (MRA), 42 Pa.C.S.A. §§ 6151–6160, can be read into a private contract between a plaintiff law firm procuring medical records from a hospital's third party record-copying service company. The service company overcharged for the records it provided. Although the MRA did not provide a remedy or otherwise address how, if at all, an overcharged party could obtain redress for an overcharge, the Supreme Court held the MRA's pricing caps or limits were an implied term of the contract between the law firm and the record-copying service company.

**17.** The Consumer Notice sets forth most of the significant consumer-protection provisions, including the duty to disclose conflicts of interest and to deal honestly and in good faith. Irvin's Broker Agreement incorporated the Consumer Notice and recited, albeit incorrectly, it had been received by Blooms.

**18.** *See* footnote 10 reminding that we can affirm the trial court on a ground different than used by the trial court.

¶ 53 Because "[a] principal purpose of the Act is to protect buyers and sellers of real estate, the most expensive item many persons ever buy or sell, from abuse by persons engaged in the business," *Meyer v. Gwynedd Development Group*, 756 A.2d 67, 69 (Pa.Super.2000), Irvin's violations are material breaches of Skiff's contract with Blooms and forfeit Skiff's entitlement to a commission. *See Lane Enterprises, Inc. v. L.B. Foster Co.*, 700 A.2d 465, 471 (Pa.Super.1997) (holding a material breach of a contract excuses performance by the other party).

¶ 54 In conclusion, we reverse the trial court order awarding judgment to Buckingham on the slander of title and tortious interference with contractual relations causes of action. We affirm that portion of the trial court order denying Skiff a brokerage commission.