J-A02009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ESTATE OF CALEEM L. JABBOUR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: ARLENE JABBOUR AND TERRI L. VARGO | : | |
| | : | No. 75 WDA 2017 |

Appeal from the Order Entered December 15, 2016
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  02-15-01692

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                                    **FILED JULY 17, 2018**

Co-Executrix Terri L. Vargo, the stepdaughter of Caleem L. Jabbour

("Decedent"),[1] and her mother, Arlene Jabbour, Decedent's second wife

(collectively "Petitioners"), appeal from the December 15, 2016 order

dismissing the citation directed to Emmett Pais, Maura Nicotra, and Donna

Genes (collectively "Respondents").  Petitioners alleged that Respondents

removed assets of Decedent's accounting business,[2] and they sought

---

[1]  The record reflects that the underlying petition for citation was filed solely by Co-Executrix Terri L. Vargo.  Co-Executrix Maura Nicotra also filed a petition for citation directed to Arlene Jabbour challenging her exercise of a power of attorney.  Both citations were disposed of by the order entered December 15, 2016, and the parties filed separate appeals to this Court. The Nicotra appeal is listed at No. 1952 WDA 2016.  We declined to consolidate the appeals, but listed them consecutively for oral argument before the same panel.

[2] The petition purportedly sought a citation directing an accounting, a denial of which would not have been a final order for purposes of appeal.  However,
*(Footnote Continued Next Page)*

compensation on behalf of the Estate for the income allegedly received by Respondents therefrom. After thorough review, we affirm.

Decedent had a public accounting business trading under the name "C.L. Jabbour, PA." He was a sole practitioner and his office was located in the home he shared with his second wife, Arlene. Decedent prepared tax returns for approximately 400 clients, and provided additional accounting services for another twenty to thirty business clients. N.T, 10/12-13/16, at 34. Maura is Decedent's daughter from his first marriage, and Co-Executrix of his estate. Mr. Pais is a CPA whom Decedent knew professionally, and to whom Maura turned for assistance in winding up Decedent's accounting practice. Ms. Genes was Decedent's secretary for thirty years.

In early August of 2014, Decedent suffered a stroke and was hospitalized for one month. During that time, Mr. Pais went to Decedent's office and performed services for Decedent's clients. When Decedent was still unable to work upon returning home, Decedent referred his clients in need of assistance to Mr. Pais and another accountant, Bill Knight.

In December 2014, Decedent sent a letter to each of his business clients informing them that he would be unable to prepare their personal and

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯

Petitioners was actually seeking compensation either from Mr. Pais for his alleged misappropriation/conversion of Decedent's business and/or from Maura Nicotra for breach of fiduciary duty in failing to obtain payment from Mr. Pais for the business. As such, it is an order determining an interest in real or personal property, appealable pursuant to Pa.R.A.P. 342(6).

corporate tax returns. He stated therein that he would provide them with their income and expense information to enable them to prepare the returns. He told them he would continue to do their monthly work and prepare W-2s until they retained another accountant. Decedent thanked them for being loyal clients, and expressed his pleasure working with them over the years. At approximately the same time, at Decedent's direction, Ms. Genes cancelled his prior order for a $2,000 computer tax preparation program.

Decedent died on December 22, 2014. Shortly thereafter, clients began calling the office about their fourth quarter payroll taxes and files. Arlene had a difficult time returning the calls. In early January, she began to pack up Decedent's files. Decedent's former attorney, Gary Kalmeyer, advised her that Decedent's daughter, Maura, wanted to close her father's business, which she was entitled to do as Co-Executrix under Decedent's Will. Shortly thereafter, Arlene left a message on Maura's answering machine asking that she and her husband help with the transition of Decedent's files. Maura returned the call and arranged with Arlene to stop by with Mr. Pais on January 17, 2015, to collect the files in order to contact the clients.

When Maura and Mr. Pais arrived with their spouses, Arlene and her grandson were present. Many of the files were boxed and "pretty organized." *Id*. at 127. Several telephone calls were made to Ms. Genes to ask for assistance in locating certain items. At Mr. Pais's direction, Maura

removed the hard drives from the computers, which contained confidential client information that needed to be secured. Maura subsequently returned the hard drives to Arlene after they had been wiped clean.

Mr. Pais contacted all of Decedent's former clients and arranged for the return of their files. Where there were outstanding balances owing for accounting services rendered by Decedent, he collected those sums and forwarded the checks to the Estate.

On April 6, 2015, letters testamentary issued to Maura and Terri Vargo, as co-executrices for the Decedent's estate. On December 22, 2015, Ms. Vargo filed the within petition for citation directed to Respondents in which she alleged that Decedent died testate possessed of personal property in the nature of his accounting practice, C.L. Jabbour, PA. Petition for Citation, 12/22/15, at 1. She charged that Respondents removed the business property of Decedent without legal authority and prior to the official opening of the Estate, and that the Estate was owed compensation for Mr. Pais's "impromptu and informal assumption of decedent's accounting practice." *Id*. at ¶21. She alleged further that the removal of Decedent's business property, without compensation, "constitute[d] theft, breach of contract, assumpsit, trespass, unjust enrichment and unlawful conversion of estate property." *Id*. at ¶23.

Mr. Pais filed an answer admitting that he took possession of the files in the presence of and with the permission of Maura and Arlene to assist the

Estate in releasing records necessary for clients to prepare fourth quarter and year-end payroll tax returns. Mr. Pais denied engaging in any illegal activity, and averred that he had provided to the Estate an accounting of all of his business revenues on March 9, 2015, together with copies of checks payable to the Estate that he had turned over. He denied that he removed the hard drives from the office computers and averred that he never agreed to purchase the business. He alleged that Decedent terminated his business with the mailings on December 10, 2014. Pais Answer to Petition for Citation, 2/2/15, at 3 ¶14.

Ms. Genes filed an answer stating that she was not present when the files were removed, and denying that she supplied any passwords to Mr. Pais and Maura to enable them to gain access to the computers. Maura averred that she had been advised by her late father's attorney that, as co-executrix, it was her responsibility to windup Decedent's practice. Nicotra Answer and New Matter, 1/28/16, at ¶26. She became involved upon learning from former clients that Arlene was not responding to their requests for their files, and that at least two clients had complained to the district justice about the situation. *Id*. at ¶¶27-28. She enlisted Mr. Pais's assistance in contacting Decedent's former clients to inform them that they could retrieve their files from him, and to enable him to collect outstanding balances owing to the Estate for services performed by Decedent's business. *Id*. at ¶17. She

denied that she received any financial remuneration from the business. *Id*. at ¶29.

After a two-day evidentiary hearing, the orphans' court dismissed the citation, finding no proof of any agreement between the Estate and Mr. Pais for the purchase of the business. Orphans' Court Opinion, 3/7/17, at unnumbered 3. In addition, the court found that Mr. Pais assisted Maura in winding up the business and returning files to clients. Finally, the court noted that without competent expert testimony from a valuation expert, it could not ascertain the fair market value of the business. *Id*. at 4.

Petitioners timely appealed and they raise three issues for our review, which we have re-ordered for ease of disposition: [3]

> I.   Did the lower court err when it held that Emmet Pais did not owe any money to the Estate when there was absolutely no evidence that the accounting practice was a gift?
>
> II.  Did the lower court err when it found it would have to speculate as to the value of [Decedent's] practice when Mr. Pais'[s] own testimony was sufficient to establish a value on the business when he testified that he had billings of $53,060.00 of income in 2015 and $30,140.00 from January 1 to August 23, 2016[,] from [Decedent's] clients?
>
> III. Did the lower court err when it disallowed Michael Wilson, a CPA, from testifying as an expert witness when he met the criteria under Pa.R.E. 702 and demonstrated that he

_____

[3] Petitioners' first issue, and to a certain extent their second issue, involve the orphans' court's findings as to liability. Since the third issue is an evidentiary one affecting damages only, we will address it last.

possessed the appropriate knowledge[,] skill, training[,] and education?

Appellants' brief at 4. Essentially, Petitioners allege that Mr. Pais either agreed to purchase Decedent's business or that he converted its assets, and that Maura breached her fiduciary duty when she did not demand compensation from him for the business assets.[4]

"Our standard of review of an orphans' court's decision is deferential." *In re Estate of Strahsmeier*, 54 A.3d 359, 362 (Pa.Super. 2012). Viewing the record in the light most favorable to the appellee, we must determine whether the record is free from legal error and whether the findings are supported by the record. *Id*. at 362-63. Since the orphans' court sits as the factfinder and determines the credibility of witnesses, we "will not reverse its credibility decisions absent an abuse of discretion." *Id*. at 363. "[A]n abuse of discretion is not merely an error of judgment. . . . [I]f in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be manifestly unreasonable or the product of partiality, prejudice, bias, or ill will, discretion has been abused." *Id*. The same deference is not afforded to the orphans' court's conclusions of law. "Where the rules of law on which the orphans' court relied are

_____

[4] Petitioners speak generally in terms of the value of the business and do not define the assets or ascribe value to particular assets.

palpably wrong or clearly inapplicable, we will reverse the court's decree."

*Id*.

Petitioners allege that the orphans' court erred when it found that Mr. Pais did not owe money to the Estate. They argue that absent evidence of a gift of the practice, Mr. Pais must compensate the Estate for the business assets he either agreed to purchase, or that he misappropriated and converted.

We find no merit in Petitioners' position. The orphans' court found that Mr. Pais did not agree, either orally or in writing, to buy the practice. Thus, he owed no compensation on a contract theory. Furthermore, it rejected the notion that Mr. Pais converted or misappropriated the business. Rather, the court found that Mr. Pais assisted in winding up the practice and collecting outstanding receivables on behalf of the Estate at Maura's behest. We find that the record supports those findings.

In early January 2015, after Decedent's death, Arlene left a recorded message on Maura's answering machine that "clients are calling here crazy that they want to pick up their stuff." N.T., 10/12-13, at 66. Arlene asked for Maura's help in "getting the office cleared up." *Id*. When Maura returned the call and asked whether she could bring Emmett Pais with her, Arlene agreed. Arlene testified further that Ms. Vargo also knew that "Maura and Emmett were going to come over, and the business files were going to

be returned to people." *Id*. at 62. Arlene acknowledged that one client, Auto Addiction, intended to sue to get its file back. *Id*. at 63.

Mr. Pais removed and retained the files at Maura's request for purposes of winding up the practice. Maura removed the hard drives from the computers, took them to be wiped clean, and returned them to Arlene. Decedent's former clients were directed both by letter and by a message on Decedent's answering machine to contact Mr. Pais for their files.

In the process of returning client files, Mr. Pais collected balances owing to the Estate for work, totaling approximately $5,000, performed by Decedent, and turned over the checks to the Estate. The Estate did not compensate him for the services he provided in winding up the business. However, as a consequence of Decedent's referrals to Mr. Pais during his lifetime, as well as Mr. Pais's contact with Decedent's clients regarding the files, approximately sixty of Decedent's 420 former clients opted to retain his services. As the orphans' court observed, someone was going to have to do the work for these clients. *Id*. at 147. Even Arlene conceded that the clients were free to go wherever they wanted, and that some chose to retain Mr. Pais. *Id*. at 50.

Based on the foregoing, the orphans' court found no evidence that Respondents misappropriated or converted Decedent's business assets. We agree. "The classic definition of conversion under Pennsylvania law is 'the deprivation of another's right of property in, or use or possession of, a

chattel, or other interference therewith, without the owner's consent and without lawful justification.'" **HRANEC Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.**, 107 A.3d 114, 119 (Pa.Super. 2014) (quoting **McKeeman v. Corestates Bank, N.A**., 751 A.2d 655, 659 n.3 (Pa.Super. 2000)). Even Arlene acknowledged that the Decedent's client files were the property of the clients. Furthermore, Mr. Pais's removal and retention of the client files was with the consent of Arlene and Ms. Vargo, and at the request of Maura, one of the designated personal representatives. The purpose for removing the files was a legitimate one: to facilitate the expeditious return of client files and stave off threatened lawsuits for failing to do so. Mr. Pais also collected for the Estate outstanding accounts receivables, which were assets of the Estate. We agree with the orphans' court that Mr. Pais assisted Maura in winding up the business, returning files, collecting outstanding receivables for the Estate, and avoiding threatened lawsuits. We find no breach of fiduciary duty on Maura's part, or theft or conversion by Mr. Pais.

Nor do we find any merit in Petitioners' premise that money is owing unless the business was a gift to Mr. Pais. Appellant's brief at 25. As we explained *supra*, Petitioners failed to prove that Mr. Pais acquired Decedent's business either contractually or through misappropriation. Petitioners do not allege on appeal that the equitable doctrine of unjust enrichment provided a basis for liability herein. "Where unjust enrichment is present, the law implies the existence of a contract requiring the defendant to pay to the

plaintiff the reasonable value of the benefit conferred." *Temple Univ. Hosp., Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501, 508 (Pa.Super. 2003) (citing *Mitchell v. Moore*, 729 A.2d 1200 (Pa.Super. 1999)). In order to prevail on such a claim, the plaintiff must prove: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *Id*. at 508. The most important factor to be considered in applying the doctrine is whether the enrichment of the defendant is unjust, and only upon such a finding will the law require a party to pay the value of the benefit conferred. *Id*.

The orphans' court found that Mr. Pais assisted in winding up Decedent's practice and collecting outstanding receivables for the Estate. The Estate paid him no compensation for these valuable services. In the process, some of Decedent's former clients chose to retain Mr. Pais to perform accounting or tax services, which they were free to do. On these facts, we find no unjust enrichment.

Petitioners contend that the trial court should have used Mr. Pais's gross revenues from Decedent's former clients to arrive at a value for the business. The orphans' court rejected that approach, finding Mr. Pais's 2015 and 2016 "gross revenues are not equivalent to the fair market value of the business." Orphans' Court Opinion, 3/7/17, at unnumbered 3.

Again, we agree. Petitioners did not prove that Mr. Pais received the business. Rather, the evidence revealed only that some of Decedent's former clients chose to retain Mr. Pais to perform accounting services. Indeed, only sixty of Decedent's 420 clients, who were given a choice as to which accountant to use after their files were returned to them, decided to utilize Mr. Pais. Nor were Mr. Pais's revenues from those clients probative of the value of Decedent's practice.[5] Assuming that the value of the Decedent's business was relevant, competent expert testimony using an accepted valuation method was required to establish its value at the appropriate time.[6]

Moreover, the evidence indicated that Decedent had started to liquidate the business prior to his death. In the fall of 2014, he was referring clients to Mr. Pais and Mr. Knight. Ms. Genes explained that on December 10, 2014, Decedent sent letters to each of his business clients

_____

[5] The revenue figures may have had some probative value if it had been determined that Mr. Pais was unjustly enriched. However, since that basis for liability was not proved below, and Petitioners do not argue on appeal that reversal is warranted on that theory, we find no merit in Petitioners' claim.

[6] Notably, on appeal, Petitioners list several methods for valuing a business, to wit: investment value; going-concern value; fundamental or intrinsic value; fair market value; book value; and liquidation value. *See* Appellants' brief at 28-29. Absent from that list is the gross revenues approach advocated by Mr. Wilson. Furthermore, Petitioners cite no valuation method that would look to **Mr. Pais's** revenues in the years after Decedent's practice closed to calculate the date of death value of the business.

advising them that he was unable to prepare their individual and corporate tax returns, but that he would provide them with the income and expense information to enable them to prepare the returns. He directed them to obtain another accountant, without specifying Mr. Pais, and thanked them for their loyalty. *Id*. at 137. Ms. Genes testified further that Decedent asked Mr. Pais to prepare tax returns in December 2014 because he realized that he could not do them. At that same time, Decedent also directed Ms. Genes to cancel the tax program that he purchased, explaining that he could not do the work. *Id*. at 141.

Hence, we find ample support for Mr. Pais's contention that Decedent was in the process of liquidating his business when he died. While the business may have had some assets in January 2015, they consisted largely of office furniture, computers, and accounts receivables. As this Court noted in *Beasley v. Beasley*, 518 A.2d 545, 552 (Pa.Super. 1986), which involved the value of a law practice operated as a sole proprietorship for purposes of equitable distribution, there may be some good will value based on professional reputation. Nonetheless, we observed:

> When a sole proprietor terminates his activity, the lights go out, the value of the sole proprietorship is extinguished and is non-transferable; the clients in the law firm cannot be sold, they can only be transferred and they have the absolute right to select their own future representation; nothing remains in residue which could be determined of value aside from tangible physical property, or work performed on partially completed cases, which may entitle the lawyer or his heirs to a *quantum meruit* payment.

- 13 -

*Id*. at 552. Those same considerations are relevant herein in determining what value, if any, should be assigned to Decedent's sole proprietorship.

We turn now to the evidentiary issue raised by Petitioners. "When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law" ***Phillips v. Lock***, 86 A.3d 906, 920 (Pa.Super. 2014) (citation omitted). "In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party." *Id*. (citation omitted); ***see also Mitchell v. Shikora***, 161 A.3d 970, 972 (Pa.Super. 2017).

The specific ruling at issue herein involved the court's determination that Mr. Wilson was not qualified to provide expert valuation testimony under Pa.R.E. 702. The question whether a witness is qualified to testify as an expert rests within the sound discretion of the trial court. ***Miller v. Brass Rail Tavern, Inc.***, 664 A.2d 525, 528 (Pa. 1995). Where a proffered expert has any reasonable pretension to specialized knowledge on the subject, generally he will be permitted to testify. The weight to be given the testimony is for the factfinder to determine. *Id*. The admissibility of expert testimony is not based solely on academic credentials. *Id*. An expert may possess sufficient knowledge based on his experience and training to qualify. *Id*.

Petitioners listed Mr. Wilson as her valuation expert in her pretrial statement and later supplemented it with his expert report. Mr. Wilson's report consisted of one paragraph:

Our firm has acquired tax and accounting practices over the past several years. The common method for valuation of accounting practices is based on the annual revenues for the practice. Typically, the value is based upon the most recent year's gross revenue, with adjustments for varying circumstances relative to the particular practice. Based on information that has been provided to me, the gross revenues for Mr. Jabbour's practice for the year ended 12/31/13 were $38,250, as reported on Pa. Schedule C – Profit or Loss from Business on his Pa 40 Individual Income Tax Return. I believe that this amount is an appropriate value to be used to establish the value of his practice.

Expert Report of Michael C. Wilson CPA, 3/2/16, at 1.

Prior to trial, Respondents moved to strike the expert report, citing its lack of detail, the absence of supporting documentation, and the fact that the opinions contained therein were not stated to a reasonable degree of accounting certainty. The orphans' court declined to rule, noting that Respondents could explore the inadequacies on cross-examination. It concluded, "If you feel and I feel at the end of that that there's some substance, we'll grant your motion." N.T., 10/12-13/16, at 13. Respondents added that the report should be stricken on the additional basis that valuation of the business was not relevant. The only issue was whether an accounting should be done.

During *voir dire* as to qualifications, Petitioners established that Mr. Wilson had a master's degree in accounting, had been a CPA for twenty-one

years, and that he was currently a member of the tax practice of Donnelly-Boland and Associates. Mr. Wilson's experience in valuing accounting practices came from Donnelly-Boland's acquisition of three practices from deceased or retiring practitioners, as well as client engagements that involved business acquisitions or divestitures. He maintained that he had experience in the field although he had never testified as a valuation expert.

On cross-examination as to his qualifications, Mr. Wilson acknowledged that he was not accredited or certified as a business valuator, and that he had never taught any courses or written any articles or books on the subject. He did not refer to any AICPA[7] guidelines in authoring his report or in arriving at his opinion. He had never prepared a valuation report before, although he stated that his firm had purchased practices based on the same type of information that was provided in his letter report. The witness testified that if one was to "ask any CPA that has acquired practices, they will tell you that the common method used to value accounting practices is gross revenues." *Id*. at 27. When asked if there was any way to check his figures, the witness stated that "[i]f we had a copy of the 2013 tax return, they can verify the gross revenues reported."[8] *Id*.

---

[7] The American Institute of Certified Public Accountants.

[8] The tax return is not contained in the certified record.

Counsel for Respondents renewed his objection to the qualifications of Mr. Wilson and argued that his report did not meet the standards for a valuation report under the AICPA principles. The orphans' court agreed and excluded the proffered expert testimony, but left the door open to revisiting its ruling later. The court also was receptive to the possibility of Mr. Wilson testifying as a fact witness regarding Decedent's tax returns. Petitioners made a proffer of the witness' proposed factual testimony: "The proffer would be that he has an opinion on the basis of the business." *Id*. at 31. The court rejected the proffer as opinion testimony.[9]

In its Rule 1925(a) opinion, the orphans' court further explained the rationale for its decision. The court found that Mr. Wilson had never performed a business valuation, and he had no knowledge of the methodologies used in the field to value businesses. Thus, the court concluded that he was not qualified to offer expert testimony regarding the value of Decedent's business.

Petitioners contend herein that the orphans' court abused its discretion in excluding the expert testimony of Mr. Wilson. They maintains that he is a CPA by education, and his experience and practical training qualified him to

---

[9]  A brief discussion occurred during which Petitioners represented to the court that the witness's accounting firm "examined the business to potentially purchase it and decided not to." N.T., 10/12-13/16, at 31. The court found the testimony irrelevant in the "constellation upon which [Petitioners were] bringing this," and sustained Respondents' objection. *Id*. at 31-32. That ruling is not challenged on appeal.

testify as a valuation expert. Thus, they contend, he had the pretension to specialized knowledge on the valuation of Decedent's business to qualify as an expert under Pa.R.E. 702.

Respondents counter that, in a non-jury proceeding, the trial court's discretion is even broader as it is "the finder of fact and the sole judge of credibility." *Costa v. City of Allentown*, 153 A.3d 1159, 1168 (Pa.Cmwlth. 2017). In addition, they cite *Ramalingam v. Keller Williams Realty Group, Inc.*, 121 A.3d 1034, 1047 (Pa.Super. 2015), and Pa.R.C.P. 1038, for the proposition that "in a non-jury trial, the trial judge has the dual function of making rulings of law, and weighing the evidence as a fact-finder." They suggest that the court's ruling was part and parcel of its larger credibility determination, and that the court rejected Mr. Wilson's premise that the fair market value of the business was equivalent to its gross revenues from the most recent year. Respondents contend that the decision should not be reversed absent an abuse of discretion, which was not demonstrated herein.

We agree with Petitioners that Mr. Wilson had sufficient pretension to specialized knowledge and/or experience to offer his expert opinion of the value of [Decedent's] practice. However, even though the trial court erred in this respect, we affirm the exclusion of the proffered expert on the two alternative bases argued by Respondents, namely, that his expert report was inadequate, and that the value of the business was irrelevant.

Pennsylvania Rule of Civil Procedure 4003.5 requires parties "to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Pa.R.C.P. 4003.5(a)(1)(b). The reports must be specific and fully disclose the basis for the opinions. *Walsh v. Kubiak*, 661 A.2d 416, 422 (Pa.Super. 1995); *Wilkes Barre Iron & Wire Works, Inc. v. Pargas Wilkes Barre Inc.*, 502 A.2d 210, 213 (Pa.Super. 1985).

The report herein was barebones and conclusory. Mr. Wilson did not even identify the relevant date for valuation purposes. Apparently, he reviewed only a tax return showing gross revenues for 2013. His opinion was simply that the gross revenues reported for the year ending December 31, 2013 on PA Schedule C appended to Decedent's PA 40 individual income tax return for 2013 was an appropriate value for Decedent's business. The tax return was not in evidence. Although his methodology contemplated "adjustments for varying circumstances relative to the particular practice," he did not identify or consider any circumstances.

We find the report wholly inadequate under Pa.R.C.P. 4003.5. It lacked foundation and specificity. Moreover, it was apparent from the face of the report that Mr. Wilson did not actually apply the gross revenues method he described therein. Despite Mr. Wilson's representation that the method typically references the most recent year of gross revenues, he used the 2013 figure instead of the gross revenues from most recent year, 2014,

and offered no explanation for the departure. Nor did he identify or consider any other information peculiar to Decedent's practice to determine whether adjustments were warranted. Nevertheless, Mr. Wilson concluded that the 2013 gross revenues figure was "an appropriate value to be used to establish the value of [Decedent's] practice." Simply stated, the expert report, on its face, did not establish that he applied the valuation method that he advocated. Furthermore, although his opinion need not be rendered with the magic words "reasonable accounting certainty," Mr. Wilson's belief that the 2013 gross revenue figure was "appropriate," without more, did not meet the requisite certainty for expert testimony. On this basis, we find the expert's proffered testimony was properly excluded.

Finally, since we have concluded that Petitioners failed to prove that Respondents were liable to the Estate for the value of Decedent's business, we find any valuation of the business irrelevant. Since we may affirm on any basis supported by the record, we affirm the trial court's decision to exclude Mr. Wilson's proffered expert testimony on these alternative grounds. *See Skiff re Business, Inc. v. Buckingham Ridgeview, LP*, 991 A.2d 956, 963 n.9 (Pa.Super. 2010) (this Court may affirm on an alternative basis from the trial court).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/17/2018